**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: August 08 2011

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 10-30733 |
| | ) | |
| Robert W. Olds and | ) | Chapter 7 |
| Sharon F. Olds, | ) | |
| | ) | Adv. Pro. No. 10-3167 |
|         Debtors. | ) | |
| | ) | Hon. Mary Ann Whipple |
| Midwest Community Federal Credit Union, | ) | |
| | ) | |
|         Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Robert W. Olds, et al., | ) | |
| | ) | |
|         Defendants. | ) | |

### MEMORANDUM OF DECISION

This adversary proceeding is before the Court for decision after trial on the amended complaint of Plaintiff Midwest Community Federal Credit Union ("the Credit Union") alleging that debts owed to it by Defendants should be excepted from discharge under 11 U.S.C. § 523(a)(2). Alternatively, the Credit Union objects to Defendants' Chapter 7 discharges under 11 U.S.C. § 727(a)(2) and (a)(4).

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b)

as a civil proceeding arising in a case under or arising under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to determine objections to discharge and the dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(I) and (J).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that Defendant Sharon F. Olds' discharge will be denied pursuant to 11 U.S.C. § 727(a)(4), and that Defendant Robert W. Olds is entitled to judgment in his favor on the amended complaint.

## FINDINGS OF FACT

Defendants are sixty-two years old and are debtors in the underlying Chapter 7 case that was commenced on February 15, 2010. Over an eight month period between August 2007 and March 2008, Defendants obtained five separate loans from the Credit Union. The Credit Union's complaint is based in part upon allegedly false statements in the applications for those loans and in Defendants' Personal Financial Statement submitted in connection with the loans.

The first loan was obtained by Sharon Olds on August 4, 2007, through an indirect auto loan application completed at a car dealership. The handwritten information contained in the application is not in Sharon Olds' handwriting. However, she testified that she did sign the application. The information in the application includes statements that she is a "Self Employed - Coordinator for Tours" and that her "gross annual salary" is $40,000. The application also discloses her husband's income of $40,000. [Pl. Ex. 1]. After a $4,000 down payment, Sharon Olds obtained the loan in the amount of $3,500 for the purchase of a 2000 Monte Carlo ("the Monte Carlo loan"). [*Id.*] She currently owes $546.86 and has reaffirmed the loan. In October 2007, in response to a mailer sent by the Credit Union, Defendants applied for and received a Visa credit card. According to Mike Gritzmaker, Vice President of lending at the Credit Union, the mailer was sent to all members of the Credit Union who had an open credit card or line of credit and a credit score of 640 or higher. The application for the credit card requested limited financial information – gross annual income and Defendants' monthly mortgage payment. [Pl. Ex. 2, p. 1]. Sharon Olds completed

the application, indicating that she was self-employed and stating that her gross annual income was $22,500 and her husband's gross annual income was $43,000. The application was signed by both Defendants. [*Id.*]. Gritzmaker testified that he approved the application after reviewing the information it provided, Defendants' credit score, and the debt ratio, which he explained is the ratio of disclosed debt to disclosed income. However, given the limited financial information requested in the application, the court does not believe that the Visa application was approved based on Gritzmaker's determination that the disclosed information complied with the Credit Union's debt to income ratio guidelines. Defendants currently owe a principal balance of $10,020.87.

The last three loan applications were all completed on February 28, 2008, at the Credit Union. [Pl. Exs. 3, 4 & 5]. One application was for a loan in the amount of $28,409 in order to refinance a loan for a Ford Escape owned by Robert Olds ("Ford Escape loan"). The second application for an unsecured consolidation loan in the amount of $15,130 ("Consolidation loan") was completed at the suggestion of the loan officer in order to pay off higher interest credit card debts. The third application was for a home equity line of credit ("Home Equity loan") in the amount of $26,300.

According to Gritzmaker, in the normal course of business, a loan officer of the Credit Union types on the application information that is obtained directly from an applicant, and the applicant then reviews the application and signs it. Gritzmaker testified that the loan approval process then involves obtaining a credit report and calculating the debt to income ratio to determine if it is within the Credit Union's guidelines. A loan officer has lending authority for car loans up to $40,000, for unsecured loans up to $15,000 if the loan officer is experienced and $10,000 if not, and for home equity loans up to $50,000.

Robert Olds testified that a young woman employed by the Credit Union assisted them with the applications while a second woman came in and out of the room checking on her. While the Home Equity loan application was completed in the loan officer's handwriting, the applications for the Ford Escape loan and the Consolidation loan were completed by entering typewritten information. All three applications state that S&B Tours is Sharon Olds' "current employer" and that her monthly income is $3,333. [*Id.*]. On the Home Equity loan application, the applicant must indicate whether the stated monthly income is "net" or "gross." The "gross" box is checked. [Pl. Ex. 5, p. 1]. The application also set forth Robert Olds' employment at Manville and his monthly income of $3,583. [*Id.*]. Both Defendants signed all three applications.

Sharon Olds testified that when asked by the loan officer what her income was, she responded that

3

she did not know. She testified at trial that she was self-employed, operating a business known as S&B Tours for approximately eighteen years in which she arranged bus tours to casinos. She testified that she does not operate the business to make a lot of money but, rather, to address her boredom at home. She also admitted at the first meeting of creditors that she has a long-time gambling problem. Both she and Robert Olds testified that after she stated that she did not know the amount of her business income, the loan officer then asked her questions regarding how many people the tour bus could seat and how much she charged for the casino trips and simply multiplied those numbers to estimate her gross income. According to Defendants, the loan officer did not inquire as to any business expenses. Sharon Olds provided her income information only once to the loan officer with respect to the loan applications completed on February 28, 2008.

Gritzmaker testified that, although it is no longer the policy of the Credit Union, the policy at the time was if the applicant has been a member of the Credit Union "for awhile" and is "in good standing," it would rely on the information provided by the applicant even if the applicant is self-employed.[1] Nevertheless, Robert Olds' income was verified by requiring him to provide a copy of his pay advice and by calling his employer. However, the loan officer did not verify Sharon Olds' income. Sharon Olds testified that she understood "gross" income to mean her income before expenses. Defendants' 2007 federal income tax return shows a business loss of $534 and their 2008 return shows no business income at all. [Pl. Ex. 11, p. 1; Ex. 12, p. 1]. A Schedule C or C-EZ, however, is not included in Exhibits 11 or 12, and the record is otherwise silent as to S&B Tours' business receipts and expenses during 2007 and 2008.

In addition to the loan applications, Defendants submitted a Personal Financial Statement to the Credit Union that is dated March 14, 2008, and signed by both Defendants. [*Id.* at pp. 4-5]. The Statement consists of preprinted, general descriptions of assets and liabilities and space to fill in the appropriate dollar amount of each applicable asset and/or liability. According to Gritzmaker, Personal Financial Statements are used "when looking at unsecured debt" to determine if the applicant's net worth less exemptions that could be claimed by a debtor is adequate to cover the debt.

Defendants' Personal Financial Statement is incomplete in that it does not include the real estate owned by Defendants nor the Ford Escape and Monte Carlo that are collateral for loans from the Credit Union. Included as assets of Defendants is a separate handwritten page in handwriting other than that of

---

[1] The Credit Union's policy now requires verification of income with every application.

Defendants and listing three older model vehicles as follows:

   1972 Plymouth Scamp - $8,650.00

   1973 Oldsmobile Cutlass Supreme - $9,150.00

   2000 Ford Ranger Pick-up - $6,475.00

[*Id.* at 5]. Robert Olds testified that he did not provide the values for those vehicles. By contrast, Defendants' scheduled the same three vehicles on their bankruptcy Schedule B and valued them at a total of $2,100. [Pl. Ex. 10, p. 6]. The record is silent as to the true value of the vehicles.

 Defendants' three loan applications completed on February 28, 2008, were ultimately approved. The Ford Escape loan and Consolidation loan were approved on that date, [*see* Pl. Ex. 3, p. 3 and Ex. 4, p. 3], and Defendants currently owe on those loans $18,731 and $11,553, respectively. Defendants obtained the Home Equity loan on March 20, 2008, after an appraisal and title search were completed.

 In addition to statements in the loan applications and Statement of Financial Affairs, the Credit Union's complaint is also based on sworn statements in documents filed in connection with Defendants' Chapter 7 bankruptcy case. Specifically, and in addition to statements in their Schedule B regarding the value of the three vehicles discussed above, Defendant scheduled only $700 held in a checking account at the Credit Union, [Pl. Ex. 10, p. 4], while the Credit Union's statement of transactions shows a balance of $1,636 on the date Defendants' bankruptcy case was commenced, [Pl. Ex. 14, p. 6]. The statement of transactions also shows ATM withdrawals at a casino totaling $1,106 that were posted by the Credit Union on February 16, 2010.

 In addition, in their Statement of Financial Affairs, Defendants report no business income for Sharon Olds for 2010, business income of only $200 in 2009 and $2,000 in 2008, and checked the box "None" where required to list all property held for another person. [Pl. Ex. 7, SOFA ¶ 2, & 14]. Defendants' Chapter 7 Statement of Current Monthly Income and Means-Test Calculation also shows no income was earned by Sharon Olds during the six months prior to commencement of the case. [Pl. Ex. 8, p. 2].

 Sharon Olds also filed an Affidavit of Monthly Income wherein she states that she "was self-employed from 1993 to October 2009" and "[has] been unemployed since October 2009." [Pl. Ex. 9]. She testified that by mid-2008, business was dwindling to the point that planned casino tours were getting cancelled. She further testified that in October 2009, she experienced a fall that resulted in a crushed wrist, fractured ribs and arm. In addition, she testified that she has undergone three surgeries and has suffered a heart attack and stroke and has not been able to run her business since that time. According to Mrs. Olds,

5

she tried putting the business in her daughter's name but kept receiving checks from customers made out in her name. However, to the extent that her testimony is that she has not operated her business since October 2009 and has not continued operating her business, the court does not find such testimony credible as the evidence indicates otherwise.

Between October 8, 2009, and February 14, 2010, the day before Defendants' bankruptcy petition was filed, upcoming casino trips were advertised in their local newspaper for the following dates in 2009 – October 14 and 20, November 17, and December 1, 15, and 31, and for the following dates in 2010 – January 13 and 26, February 10 and 23. [Pl. Ex. 13, pp. 1-7]. Each advertisement included Sharon Olds' telephone number, and all but one that included no name, included the name "Sharon" as the contact person. [*Id.*]. Likewise, such advertisements have continued postpetition, including one that Sharon Olds admits she ran the day before the trial in this case. [*See id.* at 8-13]. That Sharon Olds has continued operating her casino tour business is also made clear by the facts that twenty-three checks in the total amount of $4,290 made out to her for casino trips and dated between January 21, 2010, and February 25, 2010, were deposited into her Credit Union account on March 1, 2010. [Pl. Ex. 14, p.1]. On the same date, cashier's checks made payable to Buckeye Charter and Soaring Eagle Hotel and Casino were also issued from that account in the amounts of $1,758 and $1,805, respectively. [*Id.*]. At the time of the March 1, 2010, transactions, Sharon Olds spoke with Kim Vitek, who is employed by the Credit Union as a "collector" of debts owed to it. Vitek testified that Sharon Olds told her that she had filed a bankruptcy petition and that she was continuing to run her business through her daughter's name, using an account at Farmers and Merchants Bank.

## LAW AND ANALYSIS

The Credit Union seeks a determination that all of the debts owed it by Defendants, except the reaffirmed Monte Carlo loan, are nondischargeable under 11 U.S.C. § 523(a)(2). Alternatively, the Credit Union objects to Defendants' discharges under § 727(a)(2) and (a)(4). A plaintiff must prove exceptions to dischargeability and the elements of a § 727(a) claim objecting to discharge by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291(1991); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); Fed. R. Bankr. P. 4005. The provisions of § 523(a) and § 727(a) are to be strictly construed against the creditor and liberally in favor of the debtor. *Keeney,* 227 F.3d at 683; *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

**I. 11 U.S.C. § 523(a)(2)(B)**

Section 523(a)(2)(B) provides as follows:

6

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
>
> . . . .
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>>
>> . . . .
>>
>>> (B) use of a statement in writing–
>>> (i) that is materially false;
>>> (ii) respecting the debtor's or an insider's financial condition;
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>> (iv) that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B). Although the Credit Union has not specified under which subsection of § 523(a)(2) its nondischargeability claim is brought, it bases its claim upon Defendants' written statements regarding their financial condition. Thus, § 523(a)(2)(B) governs dischargeability in this case.

In support of its claim, the Credit Union relies on statements in the relevant loan applications regarding Sharon Olds' income. However, while Defendants' income tax returns for 2007 and 2008 show no business income was earned in those years, the Credit Union has not met its burden of showing that Defendants knowingly caused false statements of income to be made in the applications with the intent to deceive. The court credits Sharon Olds' testimony to the extent she testified that she understood "gross income" to mean her income before expenses. She ran a small business out of her home. There is no evidence that she has any financial background such that she should have distinguished between gross revenue and gross income. It is not clear to the court how the amount of $3,333 per month that is shown as gross income on the loan applications was calculated. Although Defendants both testified that the Credit Union's loan officer calculated Sharon Olds' income based on questions asked regarding the number of people the tour bus could seat and the amount charged by her for the tour, the $40,000 per year figure provided in the application for the Monte Carlo loan at the car dealership in August 2007 is essentially the same as the monthly $3,333 figure, only annualized. The loan officer was not involved in taking information for that application, and the record is silent as to how the $40,000 figure was calculated for the Monte Carlo loan application. The only application completed by Sharon Olds in her own handwriting was the Visa application, which was completed just a few months before the February 28, 2008, applications. In that application, she disclosed gross annual income of only $22,500, which lends credence to her testimony regarding the loan officer calculating her income for purposes of the February 28 applications.

7

In any event, the court finds that the Credit Union did not reasonably rely on the statements of Sharon Olds' income. Although Gritzmaker testified that it was the Credit Union's policy at the time not to verify income if the applicant has been a member and was "in good standing," it nevertheless took steps to verify Robert Olds' employment and income but took no steps to verify Sharon Olds' self-employment income. *Cf. Cmty. Choice Credit Union v. Forget (In re Forget)*, 392 B.R. 773, 779 (Bankr. S.D. Iowa 2008) (concluding that the plaintiff credit union did not reasonably rely on the debtors' statements of income where it did not "inquire further to determine what it meant that the debtors had 'gross' income from self-employment"). And with respect to the three applications completed on February 28, 2008, the unreasonableness of the Credit Union's failure to verify Sharon Olds' income is underscored by the fact that, just a few months before, she had reported in her Visa application that her gross annual income was only $22,500.

The Credit Union has also failed to meet its burden under § 523(a)(2)(B) to the extent that its claim is based upon statements in Defendants' Personal Financial Statement regarding the value of the three older model vehicles. While there is a discrepancy in the value asserted in the Personal Financial Statement and the value asserted in Defendants' Schedule B, the record is silent as to the true value of the vehicles. Moreover, there is no evidence that the Credit Union relied on the Personal Financial Statement when it approved any of the loans at issue. According to Gritzmaker, the Personal Financial Statement is used when considering unsecured loans. However, Defendants' unsecured loans were approved in October 2007 and February 2008, well before Debtors completed their Personal Financial Statement, which was dated March 14, 2008.

For the foregoing reasons, the court concludes the Credit Union has not met its burden of proving its claim under § 523(a)(2)(B).

## II. 11 U.S.C. § 727(a)

### A. 11 U.S.C. § 727(a)(2)(A)

Section 727(a)(2)(A) provides that:

(a) The court shall grant the debtor a discharge unless–
    (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed,

8

>destroyed, mutilated or concealed--
>. . .
>>(B) property of the estate, after the date of the filing of the petition.

The Credit Union argues that Defendants concealed money belonging to the estate based upon Defendants' Schedule B showing only $700 in their checking account at the time of filing but the Credit Union statement of transactions for that account showing a balance of $1,636 on that date. The statement also shows certain ATM withdrawals at a casino totaling $1,106 that were posted by the Credit Union on February 16, 2010, the day after Defendants filed their petition. However, there was no testimony explaining the timing of such postings. To the extent that the withdrawal was made by Defendants before February 16 but was not posted until that date, the court cannot find that they knowingly concealed money or did so with intent to hinder, delay or defraud creditors. In fact, the value of the account would have been overstated on Schedule B. Defendants clearly disclosed the checking account on their Schedule B. The fact that the account balance that they disclosed is not exactly the balance shown in the Credit Union's statement of transactions, without more, does not support a finding that Defendants concealed property of the estate with intent to hinder, defraud or delay the trustee in performance of his duties.

The Credit Union also offered evidence of checks made out to Sharon Olds from customers scheduling a casino bus tour, some of which were dated before February 15, 2010, the date of filing. Although those checks are not disclosed in Defendants' bankruptcy schedules, the record is silent as to when Sharon Olds actually received them. The checks were not deposited until March 1, 2010. Thus, there is no evidence that she had received the checks before the commencement of Defendants' bankruptcy case. There is also no evidence that Robert Olds had any knowledge of the existence of these checks.

### B. 11 U.S.C. § 727(a)(4)(A)

A prerequisite to the privilege of discharge is complete financial disclosure. *Keeney*, 227 F.3d at 685. Thus, under § 727(a)(4)(A), a debtor is denied a discharge if "the debtor knowingly and fraudulently, in or in connection with the case. . .made a false oath or account[.]" In order to prevail, a plaintiff must prove, by a preponderance of the evidence that:

>1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*Id.* at 685. The Sixth Circuit explained fraudulent intent as contemplated under this section as follows:

9

> [I]ntent to defraud "involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." *In re Chavin*, 150 F.3d 726, 728 (7th Cir.1998). A reckless disregard as to whether a representation is true will also satisfy the intent requirement. *See id.* "'[C]ourts may deduce fraudulent intent from all the facts and circumstances of a case.'" *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir.1987). However, a debtor is entitled to discharge if false information is the result of mistake or inadvertence.

*Id.* at 685-86. A false oath is material if it "'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.'" *Id.* at 686 (quoting *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).

In its complaint, the Credit Union alleges that Defendants made a false oath or account in their Schedule B by scheduling the three older model vehicles at a value of only $2,100 while their Personal Financial Statement completed in 2008 values the same vehicles at a total of $24,275. The Credit Union, however, has not met its burden of proving that the value set forth in Defendants' Schedule B is false. As discussed above, the record is silent as to the true value of the vehicles. There is no testimony regarding the condition of the vehicles in March 2008 when the Personal Financial Statement was completed and the condition nearly two years later when Defendants filed their petition. The court will not assume that the Schedule B values are false simply because they differ from the values asserted in the Personal Financial Statement.

The Credit Union also contends that statements regarding Sharon Olds' income contained in Defendants' Statement of Financial Affairs and her Affidavit of Monthly Income constitute false oaths or accounts that were knowingly and fraudulently made. With respect to Sharon Olds' income, the Credit Union has not met its burden of showing that Defendants knowingly and fraudulently made a false oath or account. Defendants report business income of $2,000 in 2008, $200 in 2009, and zero in 2010 in their the Statement of Financial Affairs. The court does not find the fact that Defendants' loan applications show Sharon Olds' income to be significantly higher to be particularly relevant to the truthfulness of the income reported in the Statement of Financial Affairs. The timing of the loan applications, which were completed in 2007 and early 2008, does not coincide with the years for which Defendants report income in their Statement of Financial Affairs. In addition, as discussed above, Sharon Olds understood "gross income" requested in the loan applications to mean her income before expenses. The only other evidence of her

business income are Defendants' 2007 and 2008 federal income tax returns, which show a business loss in 2007 and no business income in 2008. On this evidence, Defendants, at most, overstated Sharon Olds' 2008 income by $2,000. The court would be hard pressed to find fraudulent intent in overstating income. And the Credit Union offered no other evidence of the actual business income earned during 2008, 2009 and 2010.

The court, however, finds that the Credit Union has met its burden with respect to Sharon Olds to the extent its objection to discharge is based on her Affidavit of Monthly Income filed with the court on February 15, 2010. The Bankruptcy Code and Bankruptcy Rules require debtors to file copies of all payment advices or other evidence of payment, if any, received by them from an employer within sixty days before the filing of their petition. 11 U.S.C. § 521(a)(1)(B)(iv); Fed. R. Bankr. P. 1007(b)(1)(E). Although there is no specific requirement that debtors who are self-employed or unemployed file a written statement indicating that no such pay advices exist, typically such statements are filed to avoid the risk of the automatic dismissal provision of § 521(i), and the court assumes that was at least one purpose of the affidavit filed in this case.

However, Sharon Olds does not state in her affidavit that she is self-employed and, therefore, has not received any pay advices but, rather, that she is unemployed and has been unemployed since October 2009. This statement, given under oath, is false as the court has found that Sharon Olds continued operating her casino bus tour business after October 2009 and was still operating the business at the time Defendants' bankruptcy petition was filed, as well as at the time of trial. The statement is also material as it bears a direct relationship to her business transactions and concerns her business dealings. *See Keeney,* 227 F.3d at 686. A debtor's disclosure of self-employment would likely result in an inquiry by the United States Trustee or the Chapter 7 trustee requiring the debtor to produce some documentation of her business dealings and business income, or the lack thereof. Such information may be essential in determining the existence of property belonging to the estate and to an analysis under § 707(b) as to whether granting a discharge in the case would be an abuse of the provisions of Chapter 7.

Sharon Olds obviously had knowledge of her continuing business operation and, thus, knowledge of the falsity of the statements in her affidavit. As evidence of her fraudulent intent, the court has considered her testimony that she "tried" to transfer the business to her daughter, which, as discussed earlier, the court does not find credible, and the Credit Union collector's testimony that Sharon Olds told her that she was continuing to run her business under her daughter's name, as well as her failure to otherwise explain

11

why the statement in her affidavit was made. *Cf. Khalil v. Developers Surety & Indemnity Co. (In re Khalil)*, 379 B.R. 163, 176 (BAP 9th Cir. 2007) (noting that a "debtor's failure to take advantage of the opportunity to clear up all inconsistencies and omissions" can serve as a basis for inferring an intent to deceive); *Roudebush v. Sharp (In re Sharp)*, 244 B.R. 889, 894 (Bankr. E.D. Mich. 2000) (explaining that the debtor's testimony as to his concealment and omissions "was not consistent with the responses that might be expected of an honest and forthright person."*).* On the record before it, the court concludes that Sharon Olds knowingly and fraudulently made a false oath in connection with this case warranting a denial of her Chapter 7 discharge.

But the affidavit in issue was signed only by Sharon Olds. The Credit Union has not met its burden under § 727(a)(4)(A) with respect to Robert Olds.

## **CONCLUSION**

The Credit Union has failed to meet its burden of proof on its claims against Robert Olds, and judgment on the complaint will be entered in favor of Robert Olds. The Credit Union has also failed to meet its burden of proof on its claims under 11 U.S.C. §§ 523(a)(2)(B) and § 727(a)(2)(A) against Sharon Olds. However, the Credit Union has met its burden and is entitled to judgment against Sharon Olds on its claim brought under 11 U.S.C. § 727(a)(4)(A).

A separate judgment in accordance with this Memorandum of Decision will be entered by the court.